# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **FRANK D. GUY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-05-937-RO** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Frank D. Guy ("Plaintiff") has brought this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for supplemental security income payments under the Social Security Act, 42 U.S.C. § 423. Both parties to the proceeding have consented to the exercise of jurisdiction by a United States Magistrate Judge to order the entry of judgment. Upon review of the pleadings, the record ("Tr.") and the parties' briefs, it is the opinion of this court that the Commissioner's decision should be affirmed.

## Administrative Proceedings

Plaintiff filed his application for supplemental security income payments in January, 2003, claiming that a broken hip and diabetes had become disabling as of November 4, 2000 [Tr. 50 - 52 and 62 ]. The application was denied [Tr. 26 - 27 and 30 - 31]; at Plaintiff's request, a de novo hearing was conducted by an Administrative Law Judge ("ALJ") in July, 2004 [Tr. 32 - 33 and 215 - 259]. The ALJ determined in her February, 2005, hearing decision that while Plaintiff was unable to return to any of his past relevant work, he was able to perform a significant number of jobs available in the

national economy and, consequently, was not disabled within the meaning of the Social Security Act [Tr. 12 - 21].   The Appeals Council of the Social Security Administration denied review, and Plaintiff subsequently sought review of the Commissioner's final decision in this court [Tr. 5 - 8].

## Standard of Review

This court is limited in its review of the Commissioner's final decision to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  Nonetheless, while this court can neither reweigh the evidence nor substitute its own judgment for that of the ALJ, the court's review is not superficial.  "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion."  *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted).  "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Id.* at 299.

## Determination of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C.§423(d)(1)(A).  The Commissioner applies a five-step inquiry to determine whether

a claimant is disabled.  *See* 20 C.F.R. §§416.920(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail).  Plaintiff  bears the initial burden of proving that he has one or more severe impairments.  20 C.F.R. §§ 416.912; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  Where, as here, Plaintiff makes a prima facie showing that he can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a certain type of work and that such a specific type of job exists in the national economy.  *Turner* , 754 F.2d at 328; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984).

**The ALJ's Decision and the Evidence of Record**

The ALJ determined that Plaintiff - fifty-three years old with a high school education and with past relevant work as an automobile mechanic and detailer, a heavy equipment mechanic and operator, a welder/fitter, a motorcycle mechanic, an automobile parts clerk, and a warehouse worker – was severely impaired with a history of a fall resulting in a fracture of the right acetabulum; post-traumatic arthritis of the back, right hip and left shoulder; a history of diabetic ketoacidosis; hepatitis C with laboratory testing consistent with an elevation of liver functioning; an antisocial personality; and, a history of substance abuse, in remission [Tr. 13 - 14].

Next, the ALJ  found that the severity of Plaintiff's physical impairments did not meet or equal the requirements of an Appendix 1 listed impairment.[1]  *Id.*  As to his allegedly disabling mental condition, the ALJ stated that Plaintiff has an antisocial

---

[1]*See* 20 C.F.R., Part 404, Subpart P, Appendix 1.

personality and a long history of substance abuse which has been in remission for several years [Tr. 15].

In connection with his mental impairments, Plaintiff was provided with a post-hearing  consultative mental status examination in November, 2004.  He was found to have good eye contact, logical thought processes, intact expressive language functions and recent and remote memory processes, orientation in all areas, and no difficulty in focusing attention, recalling instructions and carrying out basic tasks [Tr. 15 and 183 - 192].  On the Wechsler Adult Intelligence Scale, Plaintiff earned a verbal score of 96 (average range), a performance score of 78 ( upper borderline range), and a full scale score of 88 (low average range).  *Id.*  Plaintiff's results on the Wechsler Individual Achievement Test indicated academic functioning within the average range.  *Id.*  In connection with the  Minnesota Multiphasic Personality Inventory,  the consultative psychologist determined that

> [Plaintiff] completed the MMPI-2 in such a manner to invalidate the profile. The validity scale configuration is characteristic of a highly exaggerated, possibly malingered profile in terms of reporting psychopathology. . . . These elevations are not consistent with psychopathology in terms of clinical observations, psychiatric history or current lifestyle.  For these reasons, the profile will not be interpreted.

[Tr. 15 and 187].

It was the opinion of the examining psychologist that Plaintiff related appropriately in terms of mental status functions, in alertness, in the ability to concentrate and carry out tasks, and in social emotional behavior.  *Id.*  The consultative psychologist concluded that Plaintiff's psychiatric condition resulted in no limitations in his ability to perform work-related mental activities [Tr. 15 and 190 - 192].

4

In considering whether Plaintiff suffered from any functional limitations as a result of his mental impairments, *see generally* 20 C.F.R. § 416.920a, the ALJ concluded that Plaintiff has no more than mild restrictions in his activities of daily living. She grounded this conclusion on the fact that he is capable of household chores [Tr. 15 and 224], doing laundry, *id.,* attending church [Tr. 226], preparing food[2] [Tr. 15, 224 and 252], shopping [Tr. 15 and 224], and following sports [Tr. 15 and 185].  The ALJ noted that Plaintiff testified that he had worked on motorcycles in order to sell them,[3] and had traveled to an Oklahoma lake [Tr. 15].

The ALJ also determined that Plaintiff has mild difficulties in maintaining social functioning, noting that he has a few friends, attends church and shops.  *Id.*  The ALJ observed that although Plaintiff reported more significant social restrictions at a post-hearing consultative examination [Tr. 15 and 185], the consultative psychologist imposed no work-related mental restrictions on Plaintiff [Tr. 15 and 190 - 192].  Further, the ALJ determined that Plaintiff has no more than mild difficulties maintaining concentration, persistence and pace [Tr. 15].  He is somewhat slower on some functions but has demonstrated adequate attention, memory and concentration.  *Id.*  Concluding, then, that Plaintiff has no marked limitations in mental functioning, the ALJ found that he does not meet the criteria for a listed mental impairment [Tr. 16].

---

[2]According to his testimony at the administrative hearing, Plaintiff's meals included items that required cooking – hamburger helper, eggs – rather than simple reheating [Tr. 252].

[3]The court notes that Plaintiff's testimony on this point varied during the administrative hearing. First, he testified – using the present tense – that he would "[j]ust pick up a motorcycle and sell it, work on people's bikes," getting his jobs by word of mouth, earning a minimal amount [Tr. 223].  Later, Plaintiff testified that "[l]ast year I just gave up on everything, my motorcycles and everything," stating that, "I don't have it anymore." [Tr. 226].  At any rate, the work was performed after November 4, 2000, Plaintiff's alleged onset of disability date [Tr. 50].

Because Plaintiff has severe impairments, the ALJ continued by assessing his subjective allegations of pain and other symptoms. *Id.* In this regard, Plaintiff testified that he is unable to work due to his history of a broken hip with resulting pain of sufficient severity to affect his ability to sleep. *Id.* He also claimed – again due to the broken hip – that he has weight-bearing instability causing one fall in the year prior to the hearing. *Id.* Plaintiff testified that he has poorly controlled diabetes with a history of three diabetes-related periods of hospitalization, as well as compromised visual acuity, urinary frequency, kidney pain, and a history of hepatitis C. *Id.* He stated that he becomes confused by a combination of stress and uncontrolled blood sugar; an exposure to extreme heat results in fatigue and difficulty in breathing. *Id.* Plaintiff testified that he used a cane until shortly before the hearing. *Id.*[4]

With respect to functional restrictions, Plaintiff estimated that he is limited to sitting for ten minutes, standing for ten to fifteen minutes and walking three blocks. *Id.* He is also limited in his ability to bend, squat, crawl and kneel. *Id.* Plaintiff described his daily activities as making breakfast, napping, washing dishes, housecleaning, doing laundry, shopping, preparing meals, and attending church. *Id.* Regarding his source of income, Plaintiff receives food stamps and lives with friends who are employed. *Id.*

In summarizing Plaintiff's medical history, the ALJ found such history positive for a diagnosis of diabetes mellitus with insulin dependence since 1995 [Tr. 17]. In November, 2000, Plaintiff suffered an on-the-job injury resulting in a fractured pelvis and

---

[4]Plaintiff testified that he lost his cane approximately nine months prior to the hearing and did not have enough money to replace it [Tr. 232]. At his consultative mental examination some four months later, Plaintiff was again carrying a cane [Tr. 185].

a left shoulder injury. *Id.* He was reportedly diagnosed with hepatitis C in 1996. *Id.* The ALJ noted that, despite the foregoing medical history, in March, 2003, a consultative physical examiner found Plaintiff to be well-developed and well-nourished with an absence of hepatomegaly,[5] ascites or abdominal masses or organomegaly; an absence of numbness or tenderness in the lower legs and feet; full and equal strength with the exception of slight shoulder weakness; normal heel and toe walking; negative straight leg raising; normal hand skills; and, a safe and stable gait. *Id.*

Due to Plaintiff's fairly limited medical treatment [Tr. 258], the ALJ ordered post-hearing consultative examinations encompassing "psychological examination and an internal medical examination for check of blood pressure, eyes, x-rays, glucose and liver. . . ." [Tr. 46].  In recounting the results of the October, 2004, physical examination, the ALJ noted relevant negative findings including the ability to mount and dismount the examination table without difficulty; the absence of organomegaly or free fluid in the abdomen; negative bilateral straight leg raising; the ability to move all of the extremities; full and equal strength; the absence of muscle wasting; intact sensation; safe and steady unassisted gait; normal gross and fine manipulation; full and equal grip strength; and, the ability to effectively oppose the thumb to the foretips, manipulate small objects, and effectively grasp tools, such as a hammer [Tr. 17].  Based upon his findings, it was the opinion of the consultative physical examiner that Plaintiff's physical condition permitted him to lift/carry twenty pounds with limits on standing and with occasional postural limitations [Tr. 17 and 193 - 206].

---

[5]Hepatomegaly is defined as "enlargement of the liver." *Dorland's Illustrated Medical Dictionary,* p. 754 (27th ed. 1988).

The ALJ, concluding that Plaintiff's allegations regarding his limitations were not totally credible, found that

> Physical and mental status examinations have shown limited positive findings inconsistent with the claimant's subjective allegations. While the claimant reports problems with balance, he has had only one fall documented. He has had limited medical treatment. Although the documentary record does establish diagnoses of diabetes and hypertension, there is no evidence of complication or co-morbidities, which would prevent the claimant from engaging in a wide range of light work. Moreover, the claimant's own activities are greater than and inconsistent with his reported limitations.
>
> The claimant's profile on the Minnesota Multiphasic Personality Inventory was invalid with a configuration characteristic of a highly exaggerated and possible malingering profile. In addition, the claimant reported more significant social difficulties to a post-hearing consultative examiner that he reported at the hearing. The Administrative Law Judge finds some limitations are expected due to claimant's history of a fractured hip and his diabetes mellitus. As noted above, the findings of the Administrative Law Judge are similar to those found by the consultative examiner and are more consistent with the claimant's daily activities.

[Tr. 17 - 18, record references omitted].

Based upon the foregoing evidence and factual determinations, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC")[6] to lift/carry up to twenty pounds occasionally and ten pounds frequently; to stand/walk for a total of three hours in an eight hour work day; to stoop, kneel and climb ramps and stairs occasionally; to reach overhead with the non-dominant arm occasionally; and, to crouch and balance only infrequently. He is unable to crawl or climb ladders, ropes or scaffolds; unable to work in environments with high humidity or with temperature extremes; and, unable to work at unprotected heights [Tr. 18]. In light of his RFC for a range of light work,

---

[6]Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 416.945 (a) (1).

Plaintiff was found incapable of returning to his past relevant work, work classified as medium to heavy in exertional demand. *Id.* Accordingly, the ALJ posed hypothetical questions to a vocational expert who identified several positions, including that of self-service cashier, – light and unskilled with 21,700 positions in Oklahoma and 1,684,000 jobs available nationally – as suitable for Plaintiff [Tr. 19 and 253 - 258]. Consequently, as Plaintiff remained capable of making an adjustment to work available in significant numbers in the economy, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act [Tr. 19 - 20].

**Plaintiff's Claims of Error**

**(1) The ALJ Committed Error of Law by Failing to Give Appropriate Consideration to the Opinions of Claimant's Treating Doctors.**

Plaintiff's argument here is that the ALJ failed to give appropriate consideration to the opinions of Plaintiff's treating physician, Dr. Amy Siems. Specifically, Plaintiff contends the ALJ "*never* mentioned or appeared to give any weight" to the results of testing ordered by Dr. Siems [Doc. No. 17, p. 5].

The record reflects that Dr. Siems first saw Plaintiff on December 15, 2003, when she diagnosed Diabetes Type I and prescribed insulin and medication for the treatment of high blood pressure; her treatment notes reflect her plan to order laboratory testing and to follow-up with Plaintiff when the testing was completed [Tr. 116]. In March, 2004, Plaintiff was given additional medication along with slips for the laboratory work [Tr. 117]. The majority of the testing was completed and reported [Tr. 119 - 124 and 126 - 129] prior to April 12, 2004, the date of Dr. Siem's final treatment note [Tr. 118]. There, Dr. Siems noted her review of the testing results and diagnosed insulin-dependent

9

diabetes and hepatitis by history with certain elevations. *Id.* Dr. Siems' stated plan was to check "Hep C RNA"[7] and to give insulin, and phone numbers for further care, to the Plaintiff. *Id.* Further noted under "Plan" was "Kidney disease starting." *Id.*

Plaintiff alleges that two sets of test results were not properly weighed by the ALJ; the first was in connection with a urine microalbumin ratio [Doc. No. 17, p. 5]. Plaintiff argues that

> Testing also showed a urine microalbumin/creatinine ratio of 624. The normal value is less than 30 mcg/mg of creatinine. This test was 20.8x normal. The explanation from Diagnostic Laboratory states that microalbuminuria is present if the microalbumin/creatinine ratio exceeds 30 mcg/mg creatinine. The explanation states essentially that this would show diabetic nephropathy (Tr. 123).

[Doc. No. 17, p. 5].[8]

Contrary to Plaintiff's suggestion, the ALJ is required to weigh the *opinions* of Plaintiff's treating physicians, not to perform an independent analysis of test results or to second-guess a physician's interpretation of such results. *See* 20 C.F.R. § 416.927 (a) (2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). The record in this case clearly reveals that Dr. Siems reviewed the microalbumin/creatinine ratio test

---

[7]This test was subsequently completed later in April, 2004 [Tr. 125].

[8]Plaintiff's attorney advises the court that he is a registered Medical Technologist and is trained in evaluating test results [Doc. No. 24, p.2]. His reading of these test results is irrelevant; Dr. Siems read the results and noted her findings.

results; upon that review, she neither rendered a firm diagnosis of kidney disease[9] nor offered *any* opinion with regard to any physical restrictions, limitations or prognosis. As to Plaintiff's argument with regard to the second set of tests in connection with hepatitis C, the ALJ accepted Dr. Siems' diagnosis, finding hepatitis C to be a severe impairment. Once again, however, Dr. Siems offered no opinion as to how this impairment might functionally limit the Plaintiff, and consequently, with the diagnosis having been accepted, there was no treating physician opinion for the ALJ to weigh under the guidelines of the applicable regulation. *See* 20 C.F.R. § 416.927. The ALJ committed no error in connection with her evaluation of any opinion by a treating physician.

### (2) The ALJ Failed to Properly Assess Plaintiff's Credibility as to His Limitations and Disabling Pain.

Plaintiff alleges that the ALJ has "wholly failed to make specific findings of credibility" and has failed to make the requisite link between her credibility determination and the evidence of record [Doc. No. 17, p. 10]. In addition, Plaintiff claims that crucial evidence was ignored by the ALJ.[10]

Credibility determinations are within the province of the finder of fact – the ALJ– and will not be upset on judicial review when supported by substantial evidence. *Diaz v. Secretary of Health and Human Services,* 898 F.2d 774, 777 (10th Cir. 1990); *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995). In making her credibility assessment, the ALJ

---

[9]The report relied upon by Plaintiff states that, "The classification of a patient should be based upon at least 2 of 3 abnormal results on specimens collected within a 3 to 6 month time frame." [Tr. 123]. The record reflects no additional testing to confirm the classification.

[10]Plaintiff also refers to the ALJ's finding that, "The documentary record contains no evidence that the claimant's hip fracture did not heal within twelve months." [Tr. 14]. The ALJ did not make this finding in her credibility assessment but in her analysis of whether Plaintiff suffered from a listed impairment.

first considers whether Plaintiff has established a symptom-producing impairment by objective medical evidence and, if so, whether there is a nexus between such impairment and Plaintiff's subjective allegations of pain or other limiting symptoms.  If both of these conditions are met, the ALJ then determines, after considering both the objective and subjective evidence, whether Plaintiff's pain or other symptom is disabling.  *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987).

Next, "[w]hen the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  Social Security Ruling 96-7p, 1996 WL 374186, at 1*. Among the factors that may be considered in assessing an individual's credibility as to a disabling symptom are (1) daily activities; (2) the location, duration, frequency, and intensity of the symptom; (3) factors that precipitate and aggravate the symptom; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant has received for relief of the symptom; and, (6) any measures other than treatment the claimant has used to relieve his symptom.  *Id.,* at *3; *Luna,* 834 F.3d at 164 - 166. In making her credibility determination, the ALJ must set out the evidence upon which she relies.  *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000).  A factor-by-factor analysis is not required, however.  *Id.*

Here, as the ALJ recited in her decision, Plaintiff testified that he was unable to perform any type of work because of a hip fracture that causes weight-bearing instability

and sleep-impacting pain; he testified that he has poorly controlled diabetes with compromised visual acuity, urinary frequency and kidney pain; he testified that he has a history of hepatitis C; he indicated that a combination of stress and uncontrolled blood sugar causes him to be confused; he stated that exposure to extreme heat results in fatigue and difficulty in breathing; and, he testified that he was limited to sitting for ten minutes, standing for ten to fifteen minutes, and walking three blocks [Tr. 16].

The ALJ fully explained her reasons for concluding that Plaintiff's testimony was not totally credible.  She reviewed the findings of the consultative physicians who examined Plaintiff both before and after the hearing,[11] specifically detailing where these physicians noted   results on examination that were inconsistent with Plaintiff's subjective allegations [Tr. 17].  She found Plaintiff's claim that his weight-bearing instability was disabling to be at odds [Tr. 17] with his testimony that his legs had "given out" on him "[j]ust that one time in the last year." [Tr. 234].  The ALJ noted Plaintiff's limited resort to medical treatment.[12]  She found that while Plaintiff had been diagnosed with diabetes and hypertension, there was no indication in the records of complications that could reasonably be expected to produce the symptoms complained of by Plaintiff. *Id.*  The ALJ specifically found that Plaintiff's daily activities – making breakfast, washing dishes, housecleaning, doing laundry, shopping, preparing meals and attending church

---

[11]The ALJ, recognizing that Plaintiff had received limited medical treatment, ordered post-hearing examinations and testing [Tr. 258].

[12]Plaintiff maintains that he could not obtain treatment for his hip at several free clinics because "they weren't set up to handle that." [Tr. 233].  The records of Dr. Siems, Plaintiff's treating physician, reflect only one reference by Plaintiff to pain from a broken hip suffered a few years in the past [Tr. 118]. Plaintiff acknowledged later in his testimony that Dr. Siems' clinic was supplying him with Advil which worked well in controlling his pain [Tr. 243].

[Tr. 16] – were inconsistent with his allegations of totally disabling limitations.  She referenced the conclusion of the consultative psychologist that the results from one of Plaintiff's tests were invalid with a configuration characteristic of a highly exaggerated and possibly malingering profile [Tr. 18].  In this same vein, the ALJ observed that the description of social difficulties given by Plaintiff, post-hearing, to the consultative examining psychologist [13] suggested more significant problems than he had reported at the hearing.  *Id.*

The ALJ's credibility findings are specific and are linked to the evidence of record; her assessment of Plaintiff's credibility is supported by substantial evidence in the record.

**(3) The ALJ Did Not Resolve Conflicting Evidence and Therefore Committed Error of Law.**

Plaintiff's focus in this claim of error is on the post-hearing report of Richard Swink, Ph.D. and Clinical Psychologist [Tr. 183 - 192].  Plaintiff alleges that the report contains two internal conflicts and, thus, is not substantial evidence upon which the ALJ could rely.

The first purported conflict is between Dr. Swink's finding that Plaintiff can understand, remember and carry out instructions [Tr. 190] and his interpretation of the results of Plaintiff's scaled scores on the Wechsler Adult Intelligence Scale-Third Edition where Plaintiff was found to be "[b]orderline on immediate auditory memory on Digit Span at 5, Picture Arrangement at 6 and Picture Completion at 6." [Tr. 186].  Plaintiff

---

[13][Tr. 185].

offers no evidence to establish that this is, in fact, a conflict but argues, instead, that "it does not seem logical." [Doc. No. 17, p. 11].[14]

In the absence of something more concrete than the belief of Plaintiff's counsel that these two findings are, in fact, inconsistent, the otherwise unchallenged findings of a clinical professional who possesses the expertise and training to interpret testing and terminology unfamiliar to a layperson constitutes substantial evidence.  As an example of such scientifically-grounded terminology, information freely available on the World Wide Web explains that, "Scientists divide memory into categories based on the amount of time the memory lasts: the shortest memories lasting only milliseconds are called immediate memories, memories lasting about a minute are called working memories, and memories lasting anywhere from an hour to many years are called long-term memories."[15] The article continues by explaining that, "Immediate memory is typically so short-lived that we don't even think of it as memory; the brain uses immediate memory as a collecting bin, so that, for instance, when your eyes jump from point to point across a scene the individual snapshots are collected together into what seems like a smooth panorama." *Id.*

This same expert opinion/lay opinion dichotomy applies to Plaintiff's second purported inconsistency in Dr. Swink's report.  Dr. Swink described Plaintiff's troubled

---

[14]The ALJ forwarded the evidence – including Dr. Swink's report – which had been generated post-hearing to Plaintiff's counsel, advising that, in addition to submitting written comments concerning the new evidence, he could submit written questions to the authors of the enclosed reports [Tr. 46 - 47].  Further, Plaintiff, through his counsel, was given the opportunity to receive a supplemental hearing upon request and to subpoena witnesses and records.  *Id.*  Plaintiff's counsel responded with written objections [Tr. 212 - 214].

[15]See http://www.brainconnection.com/topics/?main=fa/memory-formation2.

past, including his membership in an outlaw-type rouge gang, drug use and imprisonment for auto theft [Tr. 184].  Dr. Swink diagnosed Anti Social Personality Disorder and Poly Substance Dependence, Alleged Long Term Remission [Tr. 187].  This, according to Plaintiff, is inconsistent with Dr. Swink's conclusion the Plaintiff was able to respond appropriately to the public, co-workers, supervisors and work-pressures [Doc. No. 17, p. 11].

Once again, Plaintiff offers only his lay and unsupported belief that these two conclusions are inconsistent.  Dr. Swink, a highly-educated and licensed professional, opined after his examination and extensive testing of Plaintiff that

> In conclusion, Mr. Guy has history highly significant for delinquency and antisocial behavior, admitted polysubstance use and addiction until a few years ago, member of a criminal motorcycle gang leading to incarceration, and no history of psychiatric treatment.  He relates disabling conditions primarily to work injuries and diabetes.
>
> He related appropriately in terms of mental status functions, alertness, ability to concentrate and carry out tasks, and *social-emotional behavior*.

[Tr. 187, emphasis added].

Plaintiff has failed to establish that the ALJ erred in relying upon Dr. Swink's report as substantial evidence.

**(4) The ALJ Relied Solely on the Testimony of Non-Examining Medical Experts as to the Ultimate Issue of Disability.**

Despite the wording of Plaintiff's fourth claim of error, he acknowledges in his briefing of the claim that Dr. Chaudry, on whose opinions the ALJ relied, examined Plaintiff following the administrative hearing [Tr. 17 and 193 - 203].  He challenges such reliance, however, for two reasons, one of which is that the ALJ "totally ignored

16

Claimant's doctors." [Doc. No. 17, p. 14].  As was discussed in connection with Plaintiff's

first claim of error, the ALJ accepted the hepatitis diagnosis of Dr. Siems, Plaintiff's

treating physician; Dr. Siems offered no firm diagnosis of kidney disease nor opinions on

any limitations caused by any impairment and, accordingly, there was nothing for the

ALJ to ignore.

Plaintiff's, or Plaintiff's counsel's, second theory is that

> Prior to the [ALJ] sending the claimant to see Dr. Chaudry post-hearing, I
> had given the [ALJ] medical reports from Dr. Siems at the ROC Medical
> Clinic (Tr. 116 - 129).  Apparently those reports, which show the claimant's
> extremely high Hepatitis C viral RNA result and Diabetic Nephropathy
> results were never sent to Dr. Chaudry for his review.  Dr. Chaudry does not
> even mention the Claimant's Hepatitis C results but only that he "claims"
> to have been diagnosed with it.  It appears that Dr. Chaudry and the ALJ
> ignored *significant clinical findings* in that the actual testing levels of the
> Hepatitis C viral RNA and microalbumin/creatinine ration results were
> ignored.

[Doc. No. 17, p.13].

Plaintiff's pure speculation aside,[16] Dr. Chaudry's report reflects that, as a part of

the examination process, he took Plaintiff's history, noting both diabetes and hepatitis.

Plaintiff's symptoms were reviewed, and a thorough physical examination was performed

in the light of this information [Tr. 193 - 199].  Dr. Chaudry, who specializes in internal

medicine, then gave his opinions on Plaintiff's functional, work-related limitations [Tr.

200 - 203].  The ALJ did not error in relying on Dr. Chaudry's opinions as evidence in

support of her findings.

---

[16]There is no indication in the record that, upon receipt of Dr. Chaudry's report, Plaintiff's counsel
submitted written questions to the physician with regard to the test results.  *See* fn. 14, supra.

**(5) The [ALJ] Erred in Finding that the Claimant Only had Mild Restrictions in Activities of Daily Living; Maintaining Social Functioning; and Maintaining Concentration, Persistence and Pace.**

Plaintiff argues that the ALJ erred at step three of the sequential process by finding that Plaintiff had only mild,[17] as compared to marked, mental functional limitations. To the contrary, substantial medical evidence of record indicates that the ALJ's findings were generous. Upon post-hearing examination and mental status testing, Dr. Swink, after noting Plaintiff's extremely troubled past [Tr. 184], found that Plaintiff now "related appropriately in terms of mental status functions, alertness, ability to concentrate and carry out tasks, and social-emotional behavior." [Tr. 187]. In completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), the psychologist concluded that Plaintiff had no limitations in his ability to perform work-related activities on a sustained basis as a result of his mental impairments [Tr. 190 - 192].

In connection with Plaintiff's activities of daily living and social functioning, *see* 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00 C (1) and (2), Dr. Swink, while noting Plaintiff's statement that he "does not want to go [to] stores because he feels uncomfortable, confused and angry about things," found Plaintiff to be independent in his personal and daily living skills, with adequate but casual grooming and hygiene [Tr. 185]. He found that Plaintiff lived with a friend – and had been driven to his appointment by a friend – but that Plaintiff stated that he does not like to get out, even

---

[17]The ALJ concluded that Plaintiff had mild difficulties in maintaining social functioning but no more than mild restrictions in activities of daily living and in maintaining concentration persistence and pace [Tr. 15].

though invited by his friend and that he does not date [Tr. 183 and 185].  Dr. Swink further observed that Plaintiff made good eye contact and was logical [Tr. 185].

As to concentration, persistence and pace, the applicable regulation provides that this functional category "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."[18]   *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00 C (3).  The regulation continues by explaining how any limitations in this area are assessed on mental status examination, for example, by subtracting serial sevens.  *Id.*  Dr. Swink's report – a report concluding that Plaintiff has the ability to concentrate and carry out tasks [Tr. 187 and 190] –  is reflective of such testing [Tr. 185 - 186].

The ALJ's assessment of only, at best, mild limitations in work-related mental abilities is well-supported by Dr. Swink's report in which *no* limitations were found [Tr. 183 - 192] and, consequently, is supported by substantial evidence.

**(6) The ALJ Improperly Applied Medical Vocational Rule 202.14 (Grids) When the Claimant had Non-Exertional Impairment Present in the Form of Pain.**

While Plaintiff seems to acknowledge that the ALJ did not rely conclusively upon the grids, he argues for reasons that are not apparent that she should not have used them at all.  The ALJ stated in her decision that she used the grids only as a framework, relying instead on the testimony of a vocational expert [Tr. 20].  The ALJ committed no legal error in this regard.  *See Thompson v. Sullivan,* 987 F.2d 1482, 1492 (10th Cir. 1993).

**(7) The ALJ's Hypothetical Questions to the VE Did Not Include ALJ of the Claimant's Impairments.**

---

[18]Plaintiff's argument on appeal focuses on Plaintiff's *physical* complaints – pain, exhaustion, urinary frequency – and how they allegedly impact his concentration and pace.

Plaintiff's argument here is that "Claimant testified as to problems with stability, pain, poor eyesight, problems with his right hip, diabetes, kidney disease and Hepatitis C [and that] [t]he ALJ's hypothetical questions to the VE never mentioned the Claimant's pain, diabetes, kidney disease or Hepatitis C." [Doc. No, 17, p.20].  He further argues that "[t]he hypothetical questions asked by an ALJ would be misleading if the questions failed to take into account the Claimant's documented non-exertional impairments, i.e., pain, limited usage of mobility, the need to lie down during the day, limited ability to sit, stand, and lift etc."  *Id.*

Plaintiff would be correct if the ALJ had found Plaintiff to be fully credible and had incorporated all of his stated limitations into her RFC assessment.  She found, instead, that while Plaintiff did have some limitations due to his history of a fractured hip and due to his diabetes, she did not believe his limitations were as severe as alleged and structured her RFC to accommodate the functional restrictions she found supported by the medical evidence and by her credibility assessment.  Plaintiff has not pointed  to a limitation that the ALJ found to exist that she did not, in turn, include in her hypothetical questioning to the vocational expert; Plaintiff has not established that the ALJ committed any error in this regard.

**(8) It was Error for the ALJ to Accept the Jobs Listed by the VE Since They Were Not Supported by Substantial Evidence.**

In her hypothetical questioning to the vocational expert, the ALJ restricted her hypothetical worker from work in high humidity or temperature extremes [Tr. 255]; the vocational expert testified that such an individual could work "as a cashier of self-service gas, DOT 211.462-010."  *Id.*  A review of the *Dictionary of Occupational Titles* ("DOT") (4th

ed. 1991) establishes that this position, Cashier II, DICOT 211.462-010, does not require exposure to temperature extremes or to humidity [Doc. No. 20, Attachment, p. 4].

The ALJ accepted the vocational expert's testimony as evidence in support of her finding that Plaintiff was not disabled [Tr. 19]. Plaintiff's counsel, however, disagrees both with the testimony of the vocational expert [Doc. No. 17, p. 22] and with the DOT, arguing that it is "common knowledge" that Plaintiff would be exposed to temperature extremes and high humidity if performing this type of work in Oklahoma [Doc. No. 24, p.9]. Counsel's disagreement with the DOT aside, the ALJ was entitled to rely upon the expert testimony of the vocational expert – testimony consistent with the DOT – and such testimony provided substantial evidence in support of the ALJ's findings at step five. *Gay v. Sullivan,* 986 F.2d 1336, 1340 (10th Cir. 1993).

## Conclusion

The decision of the Commissioner is affirmed. Judgment will be entered accordingly.

IT IS SO ORDERED this 21st day of June, 2006.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE